UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JULIE FLAMME, | Case No.: 3:20-CV-01050-WVG |
| Plaintiff, | |
| vs. | **DIRECT ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT** |
| ANDREW SAUL, | |
| Commissioner of Social Security, | |
| Defendant | |

## I.   INTRODUCTION

Pending before the Court is Julie Flamme's ("Plaintiff") Motion for Summary Judgment and Commissioner of Social Security Andrew Saul's ("Defendant" or "Commissioner") Cross-Motion for Summary Judgment. (Doc. Nos. 11-1, 12.) Plaintiff alleges she suffers from severe disabilities that preclude her from working and filed for disability insurance benefits under the Social Security Act ("SSA"). The Commissioner denied Plaintiff's application for such benefits. (AR 864.) Plaintiff sought administrative relief from the Commissioner's decision but was

1

unsuccessful. (AR 884.)  After convening a hearing on the merits of Plaintiff's application, the Administrative Law Judge affirmed the Commissioner's decision ("ALJ"). (AR 363.) This litigation followed. Now, Plaintiff brings a Motion for Summary Judgment, alleging the ALJ's rejection of Plaintiff's treating physicians' medical opinions was not based on specific, legitimate reasons supported by substantial evidence. Plaintiff requests this Court reverse the ALJ's decision and order payment of benefits, or, in the alternative, remand. Defendant has filed a Cross-Motion for Summary Judgment, arguing the ALJ properly weighed the evidence in making his determinations. Defendant also argues the appropriate remedy, if the Court should find for Plaintiff, is not payment of benefits, but remand. Having reviewed and considered the Parties' submissions and the entirety of the administrative record, the Court GRANTS Defendant's motion and DENIES Plaintiff's motion.

## II.  BACKGROUND

### A. Procedural History

Plaintiff protectively filed an application for disability insurance benefits in October 2016, alleging disability since April 30, 2013. (AR 946-949). The Commissioner denied the claims twice, first on December 27, 2016, and second, on April 18, 2017 upon reconsideration. (AR 884-87). Plaintiff then requested a hearing before an ALJ on June 16, 2017. (AR 896-97). On May 28, 2019, the ALJ issued his decision that was unfavorable to Plaintiff (351-69). The ALJ found Plaintiff was not disabled and was capable of performing work that exists in substantial numbers in the national economy. As such, Plaintiff was not entitled to disability benefits. Plaintiff requested review of the ALJ's decision by the Appeals Council, but was denied on April 20, 2020. (AR 1-7). Plaintiff commenced this action on June 9, 2020. (Doc. No. 1.)

### B. Medical Overview

In January 2012, Plaintiff underwent an orthopedic evaluation for reported low back pain radiating into the left leg. (AR 1261). Dr. William Eves performed the evaluation. (*Id*.) Plaintiff's physical exam showed tenderness to palpation over the left paraspinal muscles, decreased range of motion, and positive straight leg raise on the left side. (AR 1262). An x-ray of the lumbar spine showed mild degenerative disc disease. (AR 1263). Dr. Eves diagnosed Plaintiff with lumbosacral spine degenerative disc disease. (AR 1263). A magnetic resonance imaging ("MRI") scan of the lumbosacral spine taken days later showed small L5-S1 disc herniation and mild L4-L5 annular bulging. (AR 1264).

In July 2014, Plaintiff stated she had low energy, but her physical and neurological examinations were within normal limits. (AR 1207-08). In December 2014, Dr. Terry Carrilio assessed Plaintiff after Plaintiff reported a history of stress, nervous breakdowns, anxiety, and depression. (AR 1197). After Plaintiff's mental status exam, which showed an obsessive and scattered thought process, Dr. Carrilio diagnosed Plaintiff with mixed personality disorder and suspected undisclosed history of psychosis or other personality disorder. (AR 1197-98).

In May 2015, Plaintiff complained of depression and was prescribed Citalopram by her primary care doctor, Eric Leute. (AR 1179). In June 2015, Plaintiff's therapist, Dr. Carrilio, stated Plaintiff appeared to be improving with antidepressant medication and therapy. (AR 1169). During this same visit, Dr. Carrilio described Plaintiff as "more organized" and "more focused" and reported Plaintiff seemed to be accomplishing tasks, and had begun to manage conflict with a "positive, problem solving approach." (AR 1169-70). Plaintiff also reported her medication was helping, and she felt more focused and less anxious, had a good appetite, and was sleeping well and exercising regularly. (AR 1173). In August 2015,

Dr. Carrilio noted Plaintiff seemed to be less depressed and anxious, but appeared more disheveled than usual; Plaintiff also appeared to be more focused and less distracted. (AR 1159). In November 2015, Plaintiff denied taking psychiatric medication, and her mental status exam was within normal limits. (AR 1143). In December 2015, Plaintiff reported therapy was "going well" and her depression and anxiety had improved. (AR 1134).

During a therapy session with Dr. Carrilio in July 2016, Plaintiff received a phone call from a friend cancelling their plans for the evening. (AR 1101). This caused Plaintiff to become flustered, disorganized, and almost incoherent when attempting to explain the situation to Dr. Carrilio. (AR 1101). In August 2016, Dr. Carrilio again noted Plaintiff presented as disheveled and distracted. (AR 1096). Plaintiff recounted vague, transient thoughts of self-harm, but "nothing serious." (AR 1096). Plaintiff spoke in broken sentences and failed to complete her thoughts. (AR 1096).

In early October 2016, Plaintiff met with Dr. Kelley De Leeuw and complained of depression and anxiety. (AR 1086). Plaintiff reported having taken St. John's Wort for most of the last year, which kept her stable. (AR 1086). Plaintiff presented a mild dysphoric affect, but her mental examination was within normal limits. (AR 1087). She was prescribed Bupropion. (AR 1087). A week later, during her next session with Dr. Carrilio, Plaintiff appeared less disheveled and more focused. (AR 1084).

On October 11, 2016, Dr. Carrilio authored a mental impairment residual functional capacity questionnaire. (AR 1230). Dr. Carrilio reported treating Plaintiff biweekly since December 2014 and diagnosing Plaintiff with depression and anxiety. (AR 1239). Dr. Carrilio also reported Plaintiff improved with medication but has become disorganized. (AR 1230). In determining Plaintiff's ability to perform work-

4

related activities on a daily basis in a regular work setting, Dr. Carrilio opined Plaintiff was unable to meet competitive standards, including: maintaining regular attendance and being punctual within customary, usual strict tolerances; sustaining an ordinary routine without special supervision; making simple work-related decisions; performing at a consistent pace without an unreasonable number and length of rest periods; and responding appropriately to changes in a routine work setting. (AR 1232-33). Dr. Carrilio also noted Plaintiff's extreme difficulty maintaining concentration, persistence or pace. (AR 1234). Plaintiff's difficulty managing simple logistics was also noted in Dr. Carrilio's report, as was her ability to get to places as scheduled, modified by her tendency to be derailed by unrelated distractors. (AR 1232-33). Finally, Dr. Carrilio noted Plaintiff becomes overwhelmed and frustrated by minor performance demands and exhibits dramatic reactions to minor physical symptoms like fatigue or illness. (AR 1233, 1235).

By November 2016, Plaintiff reported improvements in her depression and concentration with medication, and her mental status examination was within normal limits. (AR 18-19). Plaintiff also reported she "still [felt] down sometimes," but "it was nowhere to the degree" that it had been. (AR 1253). Plaintiff further stated if she had "known an antidepressant would be so helpful, I would have started a year ago." (AR 1253). In March 2017, R. Waranch, Ph.D., reviewed Plaintiff's medical files and opined Plaintiff would have difficulty with detailed and complex instructions. (AR 874-77).

In October 2017, Dr. De Leeuw again examined Plaintiff and diagnosed her with delusional disorder. (AR 1260). Plaintiff presented with a restricted affect during this visit. (AR 1260), expressed thoughts that she was being watched by her former employer, and became tearful while explaining that she was being manipulated and controlled. (AR 1258). Dr. De Leeuw reported that delusions are

generally refractory to antipsychotic medications and can self-resolve. (AR 1260). Plaintiff made it clear she was not open to a diagnosis of delusional disorder, and Dr. De Leeuw did not feel that it would be "therapeutic" at this time to challenge her. (AR 1260).

In December 2018, Dr. De Leeuw reported Plaintiff's condition was "fairly refractory" to treatment, and opined that she could no longer meet the requirements of a competitive work environment. (AR 1310). Dr. De Leeuw authored a mental impairment residual functional capacity questionnaire in February 2019, where she diagnosed Plaintiff with delusional disorder and generalized anxiety disorder. (AR 1342). Plaintiff reportedly responded well to mindfulness and motivational interviewing and was adherent to her medication, though this did not help gain insight into her delusions. (AR 1342). Dr. De Leeuw noted Plaintiff becomes easily stressed when trying to complete simply tasks and is derailed by others easily. (AR 1345). Dr. De Leeuw opined Plaintiff was mentally unable to meet competitive standards in several areas of work-related functioning required for unskilled, semiskilled, and skilled work, including maintaining regular attendance and being punctual within customary tolerances; understanding and remembering short and simple instructions; maintaining attention for two-hour segments; and sustaining an ordinary routine without special supervision. (AR 1347). In Dr. De Leeuw's opinion, Plaintiff's daily paranoia, not based in reality, would make her unable to meet competitive standards at work. (AR 1347). Plaintiff had little insight into her paranoia at the time of the report. (AR 1344).

In March 2019, Plaintiff continued to express paranoia about her new cell phone and being spied on. (AR 750). She also claimed that she had recently seen an FBI surveillance van. (AR 750). Dr. De Leeuw noted Plaintiff had a linear, logical thought process, but exhibited slight anxiety and emotional restriction. (AR 751).

Plaintiff's thought content was consistent with persecutory delusions and paranoia. (AR 751). Five days later, Plaintiff presented as disheveled with a scattered thought process. (AR 748).

On March 29, 2019, Plaintiff underwent a consultative examination with Dr. Gregory Nicholson for disability determination purposes. (AR 1349). Plaintiff presented with no psychomotor agitation or retardation and appeared genuine and truthful with no indications of manipulation. (AR 1351). Plaintiff stated she was feeling paranoid, anxious, and depressed, and had auditory hallucinations, but she did not appear to be responding to internal stimuli. (AR 1350-52). Plaintiff also reported having seen a doctor and was prescribed Wellbutrin and Abilify. (AR 1350). Plaintiff was living alone and cooking her own meals and had no difficulty dressing, bathing, and caring for her hygiene. (AR 1351). The mental status exam showed a depressed mood and dysphoric affect during the exam, though Plaintiff presented with good eye contact and interpersonal contact. (AR 1351-52). Plaintiff was able to recall one item after five minutes with hints and perform serial threes, but she answered a simple math problem incorrectly. (AR 1352). Additionally, Plaintiff believed the year was 2018, but was otherwise oriented to place, person, and purpose. (AR 1352).

At the end of the examination, Dr. Nicholson assessed an unspecified psychotic disorder and major depressive disorder. (AR 1353). He noted Plaintiff's reported anxiety was accounted for in a diagnosis of psychosis and did not require a separate diagnosis of an anxiety disorder. (AR 1353). Dr. Nicholson also observed the mental status exam showed some cognitive deficits, opined Plaintiff may have a cognitive disorder, and believed that neuropsychological testing may provide more information about Plaintiff's cognitive functioning. (AR 1353). Dr. Nicholson expected Plaintiff's condition to improve over the next year with active treatment.

(AR 1353). Finally, Dr. Nicholson opined Plaintiff retains mild limitations in her ability to interact with coworkers and the public, maintain concentration persistence and pace, accept instructions from supervisors, maintain regular attendance, and perform work activities without special supervision. (AR 1354).

In April 2019, Plaintiff reported feeling extremely fatigued and underwent a stress test as a result. (AR 744). She presented as alert and oriented, but disheveled with a scattered thought process, tangential, hyperverbal, and labile. (AR 744). In early May, Plaintiff continued to be cautious about her former boss having access to her phone. (AR 742). Her provider again described her as disheveled with a scattered thought process, tangential and hyperverbal, but also alert and oriented. (AR 742). In June 2019, Plaintiff was voluntarily admitted to Sharp Mesa Vista Hospital after disclosing she had been contemplating overdosing on her medication in previous days. (AR 22). She reported feeling hopeless and having recurrent suicidal ideations and occasionally expressed paranoid delusions that someone was following her. (AR 23). Plaintiff stabilized and was discharged five days later. (AR 20).

### C. Plaintiff's Testimony

At the hearing before the ALJ, Plaintiff testified that, although she possessed a driver's license, she has not driven in two years because she has too much anxiety. (AR 837). Plaintiff reported taking various medications, including Abilify for her mental state, Wellbutrin for depression, and inhalers for mild but persistent asthma. (AR 839). When asked why she believed she was unable to work, Plaintiff testified she was very stressed, overwhelmed, and had major anxiety, and did not have the mental, emotional, or physical strength to work. (AR 844). Plaintiff reported hearing "gibberish" voices sometimes and felt they could be real. (AR 846). Plaintiff also told the ALJ about her sciatica, which she reported suffering from since 2003. (AR

850). Plaintiff told the ALJ if she were to work again, she knew that she would miss a lot of work. (AR 852).

Additionally, Plaintiff mentioned reading when she can concentrate, but she is tired all the time. (AR 847). Plaintiff reported getting a little bit of exercise, which made her feel better. (AR 847). Plaintiff also mentioned knowing her phone was been tapped by her former boss and had bought her third phone in the last two months. (AR 849).

### D. Vocational Expert's Testimony

A vocational expert also testified at the hearing. The ALJ asked the vocational expert whether a person with Plaintiff's age, education, and prior work experience, as well as job restrictions, could find work. (AR 850-51). The vocational expert responded that the hypothetical individual could work as a Hand Packager, a Kitchen Helper, or a Food Service Worker. (AR 851). The ALJ then gave the expert the same set of facts, with an additional restriction: this person would be off task at least 20 percent of the time, due to psychological-based symptoms or fatigue. (AR 851). The expert responded that there would be no work for this individual. (AR 851).

### E. ALJ's Findings

At step one of the analysis, the ALJ found Plaintiff has not engaged in substantial gainful activity since April 30, 2013. (AR 356). At step two, the ALJ found Plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine, major depressive disorder, and psychotic disorder. (AR 356).

At step three, the ALJ found Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. (AR 357). In making this determination, the ALJ first considered the "paragraph B" criteria, where the mental impairment must result in at least one extreme or two marked limitations in a broad area of functioning. (AR

9

357).  The ALJ assessed Plaintiff had a mild limitation in understanding, remembering, or applying information and adapting or managing oneself. (AR 357). The ALJ found the Plaintiff had a moderate limitation in interacting with others and concentrating, persisting, or maintaining pace. (AR 357). The paragraph B criteria were thus not satisfied, because the Plaintiff's mental impairment did not cause at least two marked limitations or one extreme limitation. (AR 357).     The   ALJ also considered whether "paragraph C" criteria, which require the Plaintiff's mental disorders to be "serious and persistent," were satisfied.  (AR 357). The ALJ concluded that the medical evidence failed to establish the claimant achieved only marginal adjustment, and that changes or increased demands on Plaintiff would have led to exacerbation of her signs and symptoms, and to deterioration in her mental functioning. (AR 357).

Prior to step four, the ALJ found Plaintiff has the Residual Functional Capacity ("RFC")  to perform medium work, but that she was limited to no work on unprotected heights or dangerous machinery; requires a clean air environment; no temperature extremes; routine, noncomplex tasks; and no sustained intense interaction with the public, coworkers, or supervisors, but incidental or brief social conversation is not precluded. (AR 358).

At step five, the ALJ found that there were jobs that exist in significant numbers in the national economy that Plaintiff could perform. (AR 362). These jobs included Hand Packager, Kitchen Helper, and Food Service Worker. (AR 362). As such, the ALJ found Plaintiff not disabled. (AR 362).

## III.   STANDARD OF REVIEW

A district court will only disturb the Commissioner's decision if it constitutes legal error or is not supported by substantial evidence. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Fair v. Bowen*, 885 F.2d 587, 601 (9th Cir. 1989)).

"Substantial evidence" is less than a preponderance, but more than a scintilla, and is evidence that a reasonable person would consider sufficient to support a conclusion. *Id.* The ALJ is responsible for weighing and determining credibility, settling conflicts in medical testimony, and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). The ALJ's decision must be upheld if the evidence is subject to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## IV. LEGAL STANDARD

### A. Overview of Social Security Claim Proceedings

Under the Social Security Act ("the Act"), the Social Security Administration ("SSA") administers the supplemental security income ("SSI") benefits program. 42 U.S.C. § 901. The Act allows the SSA to create a process to determine eligibility for benefits and, in the case of an unsuccessful claimant, the circumstances under which those adverse decisions may be reviewed. *Id.* §§ 423 *et seq*. Defendant, as Acting Commissioner of the SSA, is responsible for administration of the Act. *Id.* § 902(a)(4), (b)(4).

### B. The SSA's Sequential Five-Step Process

The SSA uses a five-step sequential process to determine a claimant's eligibility for benefits. 20 C.F.R. §§ 416.920, 404.1520. To be eligible under the Act, a claimant must establish two criteria. First, the claimant must show he or she suffers from a medically determinable physical or mental impairment, which "results from anatomical, physiological, or psychological abnormalities" and is shown through "medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). Second, the claimant must show he or she is incapable of performing work previously performed or any other substantially gainful employment due to the impairment. *See* 42 U.S.C. §§ 423(d)(1)(A), (2)(A); 1382(c)(3)(A).

11

In addition to meeting both of these criteria, the claimant must prove he or she "either was permanently disabled or subject to a condition which became so severe as to create a disability prior to the date upon which [his or] her disability insured status expired." *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995). An administrative law judge ("ALJ") will use the five-step evaluation to determine eligibility. *See Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003) (explaining the five-step process). If the ALJ finds that a claimant is or is not disabled at any of the five steps, the evaluation ends at that step. *Corrao v. Shalala*, 20 F.3d 943, 946 (9th Cir. 1994).

The first step in the process considers a claimant's "work activity, if any." 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is found to be engaged in "substantial gainful activity," the ALJ will end the evaluation here. *Id.* §§ 404.1520(b), 416.920(b).

The analysis proceeds to the second step if the claimant cannot show gainful work activity. At step two, the ALJ will use the "severity regulation" to determine whether the claimant has a medically severe impairment or combination of impairments. *Id.* §§ 404.1520(c), 416.920(c); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). This analysis asks whether the claimant suffers from a severe impairment or combination of impairments that significantly limit the claimant's physical or mental ability to accomplish "basic work activities." 20 C.F.R. § 404.1520(c). This refers to the claimant's "abilities and aptitudes necessary to do most jobs." *Id.* §§ 404.1521(b), 416.921(b). If the ALJ does not find the claimant suffers from such an impairment or combination of impairments that renders him or her unable to fulfill these obligations, the evaluation will end.

However, if the ALJ does find a severe impairment, the evaluation proceeds to the third step. At this step, the ALJ will compare the impairment to several listed

impairments that the SSA has acknowledged are so severe that they preclude substantial gainful activity. *Id.* §§ 404.1520(d), 416.920(d). If the impairment meets or is equivalent to one of the listed impairments, the ALJ will presume the claimant disabled. *Id.* § 404.1520(d).

The ALJ must establish the claimant's RFC before proceeding to the fourth step. *Id.* §§ 404.1520(e), 404.1545(a). The RFC refers to the claimant's ability to perform physical and mental work activities on a regular basis despite limitations due to his or her impairments. *Id.* §§ 404.945(a)(1), 404.1545(a)(1). The RFC analysis asks "whether [the claimant's] impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what [the claimant] can do in a work setting." *Id.* §§ 404.1545(a)(1), 416. 945(a)(1). The ALJ must consider the claimant's impairments, including those considered non-severe, as well as relevant evidence in determining the claimant's RFC. Id. §§ 404.1545(a)(3), (e). The evaluation will proceed to step four if, at step three, the ALJ does not determine a claimant's impairment, or combination of impairments, is disabling.

At the fourth step, the ALJ will determine whether the claimant can perform the requirements of his or her past relevant work, using the claimant's RFC. *Id.* § 404.1520(f). If the claimant has the RFC to carry out his or her past relevant work, the claimant is not disabled. *Id.* § 404.1560(b)(3). If, however, the claimant does not have any past relevant work or cannot perform that work, the analysis proceeds to the fifth and final step.

At step five, the ALJ must determine whether the claimant is able to do any other work in light of his or her RFC, age, education, and work experience. *Id.* § 404.1520(g). If the claimant is unable to do other work and meets the duration requirement, the claimant is disabled. *Id.* Conversely, if the claimant can perform

other work, the claimant is not considered disabled. *Id.* The claimant generally continues to bear the burden of proving disability at this step, but a limited burden of moving forward shifts to the SSA. Here, the SSA must provide evidence showing that other work that the claimant can perform actually exists in significant numbers in the national economy, and the ALH must consider the claimant's RFC, age, education, and work experience in doing so. *Id.* §§ 404.1520, 1560(c), 416.920, 404.1512(f).

### C. SSA Hearings and Appeals Process

The Office of Disability Adjudication and Review administers a nationwide hearings and appeals program. SSA regulations set forth a four-step process for administrative review of a claimant's application for disability benefits. *See id.* §§ 416.1400, 404.900. After the SSA makes an initial determination, three more levels of appeal are available: (1) reconsideration, (2) a hearing before an ALJ, and (3) review by the Appeals Council. *See id.* §§ 416.1400, 404.900. The claimant will have 60 days to seek administrating review if he or she wishes to appeal a decision. *See id.* §§ 404.933, 416.1433. The decision becomes the SSA's—and hence Defendant's—binding and final decree if the claimant does not request review. *See id.* 404.905, 416.1405.

Various SSA field offices and state disability determination services process initial applications for disability benefits. This initial review begins when a claimant completes an application, as well as an adult disability report, and submits both documents to an SSA field office. If the SSA denies the claim, the claimant is then entitled to a hearing before an ALJ in the SSA's Office of Disability Adjudication and Review. *Id.* §§ 404.929, 416.1429. An ALJ hearing is informal and non-adversarial. *Id.* § 404.900(b).

If the ALJ's decision is unfavorable to the claimant, the claimant can request review by the Appeals Council. *Id.* §§ 404.967, 416.1467. The Appeals Council will grant, deny, dismiss, or remand the claimant's request for review. *Id.* 416.1479, 404.979. If the Appeals Council declines review of the claim or the claimant disagrees with the Appeals Council's decision, the claimant can seek the district court's review. See *id.* §§ 404.981, 416.1481. If the district court remands the claim, the claim is sent back to the Appeals Council for a decision or referral to another ALJ. *Id.* § 404.983.

## V.   DISCUSSION

Plaintiff challenges the ALJ's unfavorable decision on the grounds that the ALJ failed to provide specific, legitimate reasons supported by substantial evidence for rejecting Drs. Carrilio and De Leeuw's opinions. More specifically, Plaintiff attacks the ALJ's reason for rejecting the medical opinions: the medical records indicated improvement in Plaintiff's mental symptoms with medication and therapy. Plaintiff uses *Garrison* to argue it is improper "for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." 759 F.3d at 1017 (citing *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001)). Plaintiff also notes the new and material evidence presented to the Appeals Council after the ALJ's decision date, which Plaintiff believes supports the opinions of Drs. Carrilio and De Leeuw and further demonstrate Plaintiff's mental condition. Plaintiff alleges this, taken together, resulted in an improper rejection of the treating physicians' medical opinions. Defendant counters by asserting the ALJ's conclusion must be upheld where the evidence is supported by more than one rational interpretation. Here, Defendant argues this is the case because the ALJ found that the evidence supported limitations on mental functioning, yet also supported a higher degree of residual

15

functioning. Defendant argues Plaintiff is relying on isolated instances, for example, appearing disheveled, while ignoring "normal findings" of improvement.

**A. The ALJ's Treatment of Dr. Carrilio's and Dr. De Leeuw's Medical Opinions.**

In his decision, the ALJ gave "partial weight" to the medical opinions of Dr. Carrilio, Plaintiff's treating psychologist, and Dr. De Leeuw, Plaintiff's treating psychiatrist.  (AR 361). The ALJ gave "great weight" to their opinions of "severe mental conditions and moderate mental functional limitations," and gave "less weight" to their opinions of "marked and extreme mental functional limitations." (AR 361). In doing so, the ALJ found some objective findings of depression and reported paranoia did exist, but other mental health records indicated improvement in Plaintiff's mental symptoms with medication and therapy. (AR 361). In Plaintiff's continued therapy sessions with Dr. Carrilio in 2015, Plaintiff appeared to be improving with medication and therapy, presented as less disheveled, and seemed less stressed as she continued with "therapeutic recommendations." (AR 1159, 1169, 1175). By contrast, the ALJ gave "great weight" to the opinion of the DDS state agency mental consultant, who assessed severe depression. (AR 360). The ALJ reasoned this medical opinion was consistent with the mental status exams in the record showing a depressed mood, some difficulty with concentration tasks, and Plaintiff's self-reported depression. (AR 360).

Plaintiff argues the ALJ did not properly reject the opinions of Drs. Carrilio and De Leeuw because the ALJ did not give specific, legitimate reasons for doing so. (Doc. No. 11-1, 6:25-7:2). Plaintiff argues the ALJ's sole reason for rejecting the opinions violates *Garrison*, which held it is improper for an ALJ to deny a claimant's benefits due to isolated incidents, because the claimant's symptoms can wax and wane during treatment. 759 F.3d at 1017. Plaintiff claims she continued to suffer

16

symptoms despite ongoing treatment—she appeared more disheveled than usual in August 2015, presented as disheveled and distracted in August 2016, and spoke in broken sentences without completing her thoughts. (AR 1096, 1159). Plaintiff also relies on the new and material evidence submitted to the Appeals Council, which she argues provides further support for these two medical opinions. (Doc. No. 11-1, 8:12-14). This evidence explains Plaintiff's ongoing paranoia about her cell phone being tapped and continuing to present as scattered and disheveled during various visits. (AR 742, 744, 748, 750). Plaintiff claims this new evidence "demonstrate[s] significant, ongoing problems with [Plaintiff's] mental stability." (Doc. No. 11-1, 9:9-10). Plaintiff reported feeling hopeless, having suicidal ideations, and experiencing paranoid delusions. (AR 23). Plaintiff's ultimate position is the ALJ's focus on her instances of improvement do not constitute a specific, legitimate reason supported by substantial evidence that justify rejecting the opinions of Drs. Carrilio and De Leeuw. (Doc. No. 11-1, 9:20-23).

Defendant contends Plaintiff has not established reversible error because Plaintiff failed to address the ALJ's reliance on various "normal medical findings" that supported the ALJ's decision. (Doc. No. 12, 6:21-7:3). Moreover, Defendant argues the ALJ did provide specific, legitimate reasons that explain why the evidence supported the Plaintiff's RFC. (Doc. No. 12, 5:1-4). Defendant points to multiple mental status examinations that show depressed mood, restricted affect, and paranoia to describe the ALJ's findings of Plaintiff's limitations. (Doc. No. 12, 5:9-13). However, the ALJ also found instances where Plaintiff had a normal mood, was described by her physicians as alert and oriented, and her mental status examinations were entirely normal. (Doc. No. 12, 5:14-20). As such, Defendant argues the ALJ "reasonably found that the weight of the medical findings" were consistent with Plaintiff's RFC. (Doc. No. 12, 5:21-23). Additionally, Defendant refutes Plaintiff's

contention that the ALJ relied on isolated instances of improvement, because Plaintiff ignored the ALJ's consideration of findings throughout the entire disability period. (Doc. No. 12, 7:10-13). Finally, Defendant argues even if the Court were to find this reversible error, the proper remedy would not be payment of benefits, as Plaintiff requests, but a remand for further proceedings. (Doc. No. 12, 8:11-16).

## B. The ALJ Gave Proper Weight to the Medical Opinions of Drs. Carrilio and De Leeuw.

In the present case, the ALJ's decision to give partial weight to the treating physicians' medical opinions rests on specific, legitimate reasons supported by substantial evidence. The ALJ cites to specific medical records where Plaintiff reported improvement with antidepressants and following through with therapeutic recommendations, and presented as more organized as she continued with antidepressants and therapy. (AR 1159, 1169). During one of Plaintiff's sessions with Dr. Carrilio, Plaintiff appeared less distressed and Dr. Carrilio noted that Plaintiff appeared to be improving with the use of antidepressant medication and therapy. (AR 1169). In a later session, Dr. Carrilio assessed that Plaintiff seemed to be feeling less depressed, less anxious, and less stressed. (AR 1159). Plaintiff developed coping skills, such as making lists and managing conflict with positivity and a problem-solving approach. (AR 1169). Plaintiff argues her continued "symptoms consistent with the severity of impairment," (Doc. No. 11-1, 7:119-21) including appearing disheveled, disorganized, and paranoid thoughts (AR 1101, 1159, 1258) should govern here. However, the Court finds Defendant's argument more persuasive: the ALJ did not find that Plaintiff's symptoms disappeared entirely with treatment—rather, the ALJ accounted for Plaintiff's ongoing symptoms in his determinations. (Doc. No. 12, 7:5-7, 20-22). As such, the Court looks to this

evidence in finding that there is more than one reasonable interpretation. Under these circumstances, the Court is required to leave the ALJ's decision undisturbed.

Additionally, Plaintiff believed her medications were helping her: she felt more focused, less anxious, was sleeping well, had a good appetite, and was exercising regularly. (AR 1173). Plaintiff's physical exam in June 2015 assessed depression, but noted Plaintiff appeared more focused and less disheveled, and presented with an alert mental status. (AR 1173-74). She also described getting together more often with friends while on her medication, and continued to appear to Dr. Carrilio as less disheveled and distressed (AR 1175). Nowhere in Plaintiff's Motion for Summary Judgment are these improvements addressed—rather, Plaintiff focuses only on her ongoing symptoms that continued despite treatment.

By Plaintiff's own admission in 2016, if she had known antidepressants "would be so helpful, [she] would have started a year ago." (AR 1253). While she initially reported trouble sleeping with some of her medications, it appeared to resolve. (AR 1253). When Celexa resulted in migraines and Plaintiff did not believe Prozac would help her, she stopped taking those medications, but continued in the Bupropin and reported it had helped her. (AR 1253). There is no mention of these improvements in Plaintiff's Motion for Summary Judgment, though it does refer to "the ALJ's mere reference to [Plaintiff's] purported improvement." (Doc. No. 11-1, 9:20-21). Plaintiff also expressed her therapy sessions with Dr. Carrilio were also going well, which Plaintiff does not address in her Motion for Summary Judgment. (AR 1253).

Plaintiff also argues records dated after the ALJ's decision demonstrate "significant, ongoing problems with [Plaintiff's] mental stability, and specifically mentions her hospitalization in June 2019. (Doc. No. 11-1, 9:9-10). But this evidence is no different from evidence submitted prior to the ALJ's decision, which supports

findings of paranoia and scattered thought processes (AR 357, 359, 361). As Defendant argues, Plaintiff ignores findings in later submitted evidence that support the ALJ's findings. (Doc. No. 12, 8:28-9:1). Plaintiff's hospital records from June 2019 also indicate good grooming and hygiene, linear and coherent speech, and an alert and oriented demeanor. (AR 23, 32, 34, 39). Plaintiff does not provide any grounds to disturb the ALJ's decision based on this evidence.

Further, the evidence here is open to more than one rational interpretation. The Disability Determination Services ("DDS") state agency mental consultant examined Plaintiff in March 2017, and although Plaintiff argues that the opinion of a treating physician should be afforded greater weight than one of a physician who examined the Plaintiff one time, (Doc. 11-1, 10:24-26), the consultant's findings were supported by objective findings from both Dr. Carrilio and Dr. De Leeuw. (AR 876). For example, the consultant noted most of Plaintiff's medical progress notes from October and November 2016, just a few months prior, reported improvement in Plaintiff's symptoms. (AR 875). This is a reasonable interpretation: Plaintiff reported therapy was going well, and she noted she wished she had started antidepressants earlier. (AR 1253). Based on this information, it is rational to conclude that with continued medication and therapy, Plaintiff's conditions would have improved, as she reported they had in the past. This rational explanation requires the Court to give deference to the ALJ's decision. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *Andrews v. Shalala*, 53 F.3d 1035, 1040-41 (9th Cir. 1995); *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). Accordingly, the Court finds there is no factual or legal basis that supports disturbing the ALJ's decision.

/ / /

/ / /

**VI.   CONCLUSION**

For the foregoing reasons, Defendant's Cross-Motion for Summary Judgment (Doc. No. 12) is GRANTED and Plaintiff's Motion for Summary Judgment (Doc. No. 11-1) is DENIED.

**IT IS SO ORDERED.**

Dated: April 20, 2021

Hon. William V. Gallo
United States Magistrate Judge